**PEOPLE** v. BURNS. (Supreme Court, Appellate Division, Fourth Department. May 20, 1902.) Mortimer Burns was convicted of rape, and from the judgment, an order denying motion for arrest of judgment, and an order denying defendant's motion for a new trial, he appeals. Affirmed. Robert L. Drummond, for appellant. Harry T. Dayton, Dist. Atty., for the People.

PER CURIAM. The evidence on behalf of the people in this case very conclusively establishes the defendant's guilt, and his testimony and that of his associates is such as to leave no reasonable doubt of the fact. A jury, after a fair and impartial trial, found the defendant guilty of the crime charged in the indictment. We have examined the exceptions taken by the defendant's counsel to the rulings of the learned trial court, and are of the opinion that they do not present error prejudicial to the defendant, and such as to require a reversal of the judgment, and that under section 542 of the Code of Criminal Procedure it is the duty of this court to affirm the judgment of conviction and orders appealed from. Judgment of conviction and orders affirmed, and case remitted to the county court of Cayuga county, pursuant to section 547 of the Code of Criminal Procedure.

WILLIAMS, J. (dissenting). The judgment and orders appealed from should be reversed, and a new trial ordered. There was no dispute on the trial as to the fact that defendant had sexual intercourse with the complainant at the time and place alleged in the indictment. The only controversy upon the facts was as to whether the complainant consented to the intercourse, or offered so little resistance under the circumstances as to relieve the defendant from guilt of the crime of rape in the first degree. There were also some exceptions to the admission and rejection of evidence, and to the charge of the court, and some occurrences upon the trial, which are urged as calling for a reversal of the conviction and judgment. These are the questions to be considered upon this appeal. I have examined the evidence with a good deal of care, as to the intercourse itself and the conduct of the complainant, at

the time and subsequent thereto, as bearing upon the question of the resistance made by her, and her express or implied consent to the intercourse. I do not deem it necessary to recite the evidence in detail here. My conclusion is that there was a fair question of fact for the jury as to whether the intercourse was had against the will of the complainant and without her consent, whether her resistance was forcibly overcome, or was prevented by fear of immediate or great bodily harm, which she had reasonable cause to believe would be inflicted upon her, so as to make the defendant guilty of rape in the first degree. I do not think we would be justified in reversing the finding of the jury upon this question of fact. There are some things in the evidence which are suspicious, and which made the question a close one; but the jury saw the witnesses when they gave their evidence, and heard their cross-examination, and the suggestions of counsel on either side with reference thereto, and, if the trial was a fair one, and the jury was in no way misled to the injury of the defendant by the improper admission or rejection of evidence or instructions of the court, and if their prejudices were in no way improperly aroused by the occurrences upon the trial, I think the verdict of the jury should not be disturbed. The complainant was an unmarried woman, and was about 21 years of age. It was claimed on the part of the people that she was a virtuous girl, and had never had intercourse with a man before the occasion in question. The theory of the defense was that she was not virtuous, and that she was discovered on the occasion in question in the act of intercourse with the witness Sedore, a man 31 years of age, and that the intercourse with the defendant and his two associates followed immediately thereafter. It was on the 28th of June, 1900, about 11 o'clock at night, and the complainant and Sedore were upon the ground in the field, a little way from the railroad track, in a somewhat retired place, when the defendant and his associates joined them. The complainant returned to her boarding place between 11 and 12 o'clock at night. The next day after the intercourse, and on the 29th day of June, 1900, Dr. Parker at his office, upon the request of the recorder, made an examination of her person,—her vaginal parts. He found some excoriation of the external genitals, a chafed and reddened appearance, outer layer of the skin rubbed off inside the lips of the vulva and the opening to the vagina, some swelling of the mucous membrane at the opening and also within the vagina, and considerable discharge,—more than normal, something out of usual. There were the remains of a hymen that had been ruptured at some time, he was unable to say when. The parts inside and at the lips were in what would be called a state of irritation. On the occasion of the intercourse the complainant wore a pair of cotton drawers, closed ones, buttoned above the hips. These drawers were produced before the recorder on June 29, 1900, and upon the trial of the indictment were received in evidence and exhibited to the jury on the trial, and at that time, as well as when they were produced before the recorder, the

buttons were torn out, and the button holes were also torn, and the drawers were stained with blood, inside and out. A chemist was sworn, and testified that this blood was not menstrual, but came from a tear in the flesh or a bruise,—the opening of some blood vessel. This evidence was quite important, as showing force used in taking down complainant's drawers at the time of the intercourse, the buttonholes being torn and the buttons being torn off, instead of the drawers having been unbuttoned with her consent, and as showing a rupture of the hymen at the time of the intercourse, instead of having been ruptured at some previous time. It was necessary, therefore, that it should appear that the drawers in both the respects referred to were in the same condition, just after the intercourse, and when the complainant returned to her boarding house, as they were when produced before the recorder and upon the trial of the indictment. The complainant testified that the buttonholes and buttons were in perfect condition and the drawers unstained just prior to the intercourse; but there was no evidence given as to their condition afterwards, until they were produced before the recorder. This appears sufficiently, without examining the evidence, by the language of the court in answer to a request by defendant's counsel. "It does appear that the clothing was in the possession of the complainant from the time of the alleged assault until its delivery by her to Sedore. As to what was done with it during that time there is no evidence." Sedore was the man who was with the complainant on the night of the intercourse in question. The recorder, on the 29th of June, 1900, the next day after the intercourse, sent Sedore after the clothing, and he got it, and took it to the recorder. The complainant was not asked to say anything as to the condition of the drawers after the intercourse took place, what their condition was when she arrived home that night, and especially when they became bloodstained. For all that appears in the evidence, the blood stains may have come upon them after that night, and have been in no manner connected with or the result of the intercourse in question. The incompetency of this evidence as to the condition of the drawers, and the statements of the chemist as to the blood stains, and the incompetency of the drawers themselves as evidence, was raised during the trial, and finally by requests to charge. It seems to me this evidence was erroneously received, and that the court improperly permitted the jury to infer that the drawers were in the condition just after the intercourse that they were when produced before the recorder and upon the trial of the indictment. There should have been some evidence given by the complainant or otherwise that the drawers had not been tampered with since the intercourse took place, especially as they came from the hands of the complainant and Sedore, two persons so greatly interested in shielding themselves and in convicting the defendant. When the clothing was finally offered in evidence, objection was made to it, and the court asked defendant's counsel to point out the respects in which he claimed the evidence was insufficient

to permit the clothing to be received in evidence. Counsel thereupon stated that he did not think his duty to his client required him to do so, and declined to comply with the request of the court. The objection was then overruled, and the clothing was received in evidence. It is not difficult to understand why the counsel refused to comply with the request of the court. The defendant was being tried for a serious offense. He claimed the complainant and Sedore were ready and willing to swear to whatever was necessary to convict him. Such a charge was easily made and difficult to defend. Any suggestion by counsel, he apparently felt, would be met by recalling complainant and Sedore to meet the difficulty. The defect in the evidence was very apparent, and should have been noticed by the district attorney and the court. I am not prepared to say this refusal by defendant's counsel to comply with the request of the court is an answer now to the clearly incompetent nature of this evidence. In any event, this request and refusal related only to the articles of clothing themselves as evidence. The evidence of the chemist was still in the case, under objection and exception, and the admission of that remained uncured and erroneous. Upon cross-examination, the complainant testified that on her way to the city, just after the intercourse had taken place, she told Officer Bremer that she did not want anything done about the assault,—that she wanted the matter dropped. She was asked on the trial if she expected that night to appear in court on the matter, and if she intended to prosecute the matter. and if she was told by any one that night that she would not have to appear in court, and, if she did not make any complaint. her name would not or need not be mentioned. All these questions were objected to by the district attorney, and the objections were sustained by the court. These rulings were clearly erroneous. She was asked as to what she intended and what she was told as to the prosecution of defendant for this rape immediately after the intercourse had taken place. The evidence was very material as to her then condition of feeling, as bearing upon the question of consent or failure to resist the intercourse. I am unable to understand why it was excluded. She had already expressed her desire to drop the matter,—to have nothing done about it. She should have been permitted to say what she then expected and intended to do about it. and what was then said to her about it. She should have been permitted to answer freely. This kind of cross-examination should not have been cut short by the court. The defense had a right to find out why she had changed her mind from wanting nothing done about it, wanting it dropped, to making the serious charge of rape and prosecuting it to a trial. Defendant had a right to find out from her what was said to her on the subject that night and by whom it was said. The intercourse took place on the night of June 28, 1900,— Thursday. On June 30, 1900, Saturday night, the witness Lizzie Burns, who knew the complainant and worked in the same factory with her, met her on the street walking with another woman. Complainant spoke to the witness, and witness answered her. Witness was asked what complainant's appearance was at that time. The district attorney objected to the question, stating no grounds, and the court sustained the objection. This ruling was erroneous. The witness could not be permitted to express any opinion, but the objection was not limited, and the ruling did not sustain the objection to that extent. Facts might have been stated in answer to the question that would have been perfectly competent. The people claimed that the complainant, within 48 hours prior to this meeting, had been outraged by three young men in close succession, that she was prior to that time a virtuous girl, and was only 21 years of age. This witness had known her for some months before. She ought to have known how she appeared ordinarily. Witness' own brother was charged with having been the first of the three persons to outrage complainant. Both these girls then knew what charge was made. Was it not quite proper for the witness to indicate any facts in her appearance tending to contradict the claim that the intercourse constituted such an outrage as claimed? A virtuous girl 21 years of age ordinarily would be expected to show the results of such treatment for more than two days afterwards. Indeed, the people claimed she did show and suffered from it for weeks and months after. If this witness, in reply to the question, could state facts as to her appearance indicating no change in her, it would certainly have been competent to go to the jury, as bearing upon the question whether the intercourse was the outrage claimed by the people. Upon the trial the defendant and at least one of his associates were asked, when upon the witness stand, if they had ever before had sexual intercourse with women, and under the objection of the district attorney they were not permitted to answer. This was erroneous. If their answer had been in the negative, would not such evidence have been competent as bearing upon the probability of their having committed the crime of rape in the first degree? The jury might not have believed them, but their credibility was for the jury; and the effect to be given to the evidence, if the jury did credit their answers, was for the jury also. It was erroneous to exclude the evidence, on cross-examination of Sedore, as to what he testified to before the recorder, and whether there had been a bastardly proceeding against him, which he settled by paying a sum of money. He was an important witness. and the fullest opportunity to cross-examine him should have been allowed the defendant. The objections to this evidence were general. No specific objection was taken.

After the charge had been made to the jury, the defendant's counsel requested the court to state to the jury that the prosecutrix did not testify as a witness that she was frightened or in fear on the occasion of the intercourse alleged to have constituted the rape. This was true, and the court should have so stated to the jury. Instead of doing so, the court evaded the request, and added that the jury would be entitled to consider, even if she did not so

state, the other evidence as to what happened, with a view to ascertaining whether she was frightened, or whether she had reasonable cause to fear. This was hardly fair to the defendant. It had a tendency to create uncertainty in the minds of the jurors as to whether she had stated she was frightened or not. The fact as to whether she was frightened or not was very important, because, if she was not frightened, and by reason thereof prevented from resisting the intercourse, then that element in the statute was eliminated from the case, and she was then bound to the utmost resistance to prevent the intercourse, or the crime of rape in the first degree was not committed. It is singular that she did not say in the whole course of her examination as a witness that she was frightened, or that she was prevented from resisting because of fear. The defendant had a right to have this fact plainly appear, so that the jury could have no doubt about it. If she was not able or willing to state under oath that she was frightened, the jury might well believe she was not frightened, and then would have only the question to consider whether her resistance was such as the law required her to make, in order to establish the crime of rape in the first degree. If she was frightened, and thus prevented from making the utmost resistance, why did not she say so? Why did not the district attorney ask her the direct question? Was it because he knew she would answer in the negative, and thus take that element of the statute out of the case? It seems to me the defendant was not fairly treated by the court as to this request to charge. The complainant during the trial had spells which required her examination to be suspended for some time. The trial was suspended also, and the jurors separated, and waited until the trial was resumed, and the complainant's evidence was continued. She was a girl, and sympathy for her was natural and unavoidable. There was much, therefore, to distract the attention of the jury, and there was danger that they might not be able calmly and impartially to consider and pass upon the controverted questions of fact in the case. Under these circumstances it was the duty of the court to be careful in the conduct of the trial and lead the jury to fairly consider and dispose of the case. It seems to me the court failed to do its duty in this respect. A reading of the charge shows that it was hardly a calm, impartial submission of the case to the jury; that its tendency was rather to arouse the prejudices of the jury than to induce a calm, cool exercise of their judgment. At the very commencement of the charge, the court called the attention of the jury to the extraordinary character of the case, and to its horrible and atrocious features, and then used this remarkable language: "Now, gentlemen, it is exceedingly difficult for either courts or juries to approach their duty in such cases in the right frame of mind. The natural indignation which springs up in our minds at the mere thought of such an offense as is here charged is quite apt to excite a prejudice against the person charged with the offense, and that I ask

76 N.Y.S.—65

you to endeavor to guard against with the utmost care in this case. I want you to consider the questions which you are to consider, if possible, free from any prejudice against the defendant; not to be swayed by considerations of sympathy, or passion, or prejudice, but to endeavor, if you can, to consider this case calmly and dispassionately on the evidence, for the purpose of seeing whether, under the rules of law, which are very simple and which I will state to you, this defendant is guilty of the crime charged against him." It was thus said it was difficult, not only for juries, but for courts, to do their duty in such cases as this, and then, instead of telling the jury they must do their duty, and must consider the case calmly, and uninfluenced by passion, sympathy, or prejudice, the court asked them to endeavor to do their duty, which was so difficult for courts, as well as juries, to do, and, if possible, to consider the case free from passion and prejudice against the defendant, and endeavor, if they could, to so consider the case. Can it be said the defendant had fair treatment by such an opening of a charge as this? No comment is necessary. A mere reading of the passage quoted, in view of what had already been said as to the horrible and atrocious character of the case, shows it could have no tendency to properly stimulate a jury to the full, fair, impartial performance of their duty in the case. Many other passages in the charge might be referred to, where coloring was improperly given to the evidence, and which cannot be said to have been fair to a defendant laboring, as this defendant was, to defend himself against a charge of crime so easy to be made and so hard to be defended, even if a defendant is innocent. If there is any criminal case where the court should be entirely calm and fair and impartial, it is just such a case as this, which was surrounded by things likely to distract the minds of a jury from a deliberate examination and consideration of the conflicting evidence bearing upon the real question of fact, which was to determine the guilt or innocence of the accused. A jury should never be led to suppose or understand that the court has any difficulty in doing its duty in such a case. The court should be above such improper influences, and should make a jury feel and understand this, and that they also should hold themselves in the same state of mind.

I express no opinion as to the guilt or innocence of this defendant. It is not for this court to determine that question. The people and the defendant are both alike entitled to a verdict of a jury to determine that question; but the trial must be a fair, impartial one. The defendant must have fair play, or the court should interfere and secure him another trial. It seems to me the defendant is entitled to such relief here. The judgment and orders appealed from should therefore be reversed, and a new trial ordered.